BARRY J. PORTMAN
Federal Public Defender
JEROME MATTHEWS
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant GREGORY ALLEN BONNER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. GREGORY ALLEN BONNER, Defendant. | No. CR-08-389-SBA<br><br>NOTICE OF MOTION AND MOTION TO DISMISS INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION<br><br>Date: September 23, 2008<br>Time: 11:00 a.m. |

TO JOSEPH P. RUSSONIELLO, UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF CALIFORNIA, AND TO JAMES MANN, ASSISTANT UNITED STATES ATTORNEY:

NOTICE IS HEREBY GIVEN that on September 23, 2008, or as soon thereafter as counsel may be heard, Gregory Bonner will move dismiss the indictment in this case. The motion is made under Fed. R. Crim. P. 12(b)(2) and (3) on the grounds that the charged statute, 18 U.S.C. § 931, unconstitutionally burdens his Second Amendment right to keep and bear arms.

The motion is based upon this Notice, on the accompanying Memorandum of Points and Authorities, on the arguments of counsel, and on such evidence as may be presented at the hearing on the motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

**1. Preliminary Statement**

The government has charged Gregory Bonner with one count of possession of body armor by a violent felon, in violation of 18 U.S.C. § 931. The United States Supreme Court recently interpreted the Second Amendment as a constitutional right, guaranteed to individual persons, to defend themselves with arms. Because the Framers of the Constitution intended arms to include body armor as well as weapons, and Mr. Bonner's use of body armor in the present case was entirely defensive, the Court should dismiss the indictment.

**2. Background**

During the evening of December 8, 2007, Richmond Police saw Mr. Bonner driving with only his parking lights on, in apparent violation of the California Vehicle Code.[1] Police stopped Mr. Bonner's car and determined that he was wearing a ballistic vest, identified in the indictment as a "Second Chance K-30 trauma plate." He was arrested at the scene.

Notably, at the time of the traffic stop, Mr. Bonner was not in possession of a gun or any other type of weapon, and discovery nowhere suggests that at the time of this incident he was participating in or en route to any criminal activity, let alone criminal activity that would be violent in nature. Quite the opposite – Mr. Bonner was wearing the body armor for purely defensive reasons. His cousin, Demonte Tinsley, had been shot and killed the previous evening, and Mr. Bonner feared that as a known relative he was himself in danger. He also had been chosen to be a pall bearer at Mr. Tinsley's memorial service the following week.[2]

Mr. Bonner was taken into custody, cited and released. The present indictment followed.

---

[1] These facts are taken from a Richmond Police report provided by the government. A copy is attached as Exhibit A. Mr. Bonner concedes neither the truth nor accuracy of the report, but for purposes of this motion he asks the Court to accept them as true.

[2] Copies of a newspaper article reporting Mr. Tinsley's death and a program of the memorial services listing Mr. Bonner as a pall bearer are attached as Exhibit B.

**3. Argument**

**A. 18 U.S.C. § 931, As Applied to Mr. Bonner, Violates His Second Amendment Right to Keep and Bear Arms**

In the landmark decision *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), the Supreme Court held that the Second Amendment "guarantee[s] an individual right to possess and carry weapons in case of confrontation." 128 S. Ct. at 2797. *Heller* affirmed the individual and immutable nature of this right to self-defense and created a new test for the constitutionality of legislatively-created weapons prohibitions. Although the Court suggested – without further analysis – that laws prohibiting possession of arms by felons were not called into question by its decision, a careful reading of Justice Scalia's majority opinion reveals that the Court left open the question whether such prohibitions would withstand the new tests it had created. Applying these tests to 18 U.S.C. § 931 in general, and to Mr. Bonner's arrest in particular, it is clear that the statute's sweeping ban against possessing body armor is unconstitutional as applied to him.

1. Historical analysis.

In *Heller*, the Supreme Court held that the Second Amendment guarantees an individual's right to keep and bear arms unconnected to service in a militia, and to use those arms for traditionally lawful purposes, such as self-defense in the home. In particular, the Court held that the amendment's "operative clause," *i.e.*, "the right of the people to keep and bear arms shall not be infringed" – refers to an individual right, given that the other instances of "the people" in the Constitution, in the First, Fourth and Ninth Amendment, "unambiguously refer to individual rights, not 'collective' rights." *Id.* at 2790.

The Court also explained that the term "arms" in the operative clause included both weapons of offense and "armour of defense." *Id.* at 2791, quoting 1773 edition of Samuel Johnson's dictionary; *see id.* (noting that "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing *that a man wears for his defence*, or takes into his hands, or useth in wrath to cast at or strike another'") (emphasis added). *Heller* establishes beyond

question that possessing or using body armor is protected by the Second Amendment.

*Heller* reached its result through a historical analysis of the understanding of the right to bear arms as it existed at the time that the Constitution was adopted. Importantly, in the course of rejecting an "interest-balancing inquiry" proposed by Justice Breyer's dissent, Justice Scalia stated: "*Constitutional rights are enshrined with the scope they were understood to have when the people adopted them*, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 2821 (emphasis added, parenthesis original). In other words, the Court held that the Second Amendment protects the right to self-defense as it was understood at the time of the Founders, whether or not current-day legislators or judges agree. *Id.* at 2822 (stating that while some may think the Second Amendment is "outmoded" in our society, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table").

The Court did not, however, conclude that the text of the amendment created or bestowed this individual right to bear arms; rather, the Court repeatedly emphasized that this individual right to self-defense was a pre-existing, natural right. For example, the Court stated that "it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right" and added that "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right" because it "declares only that it 'shall not be infringed.'" *Id.* at 2797 (emphasis in original); *see id.* at 2817 (noting that "the inherent right of self-defense has been central to the Second Amendment right").

The Court completed its analysis of the operative clause by stating that in "[p]utting all of these textual elements [of that clause] together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 2797. The Court then determined that the prefatory clause ("a well regulated militia, being necessary to the security of a free state") did not limit the scope of the operative clause, but instead merely "announced the purpose for which the right [to bear arms] was codified"; that is, to prevent the elimination of the militia because of fears at the time of the founding that "the new Federal Government would destroy the

citizens' militia by taking away their arms." *Heller*, 128 S. Ct. at 2801. In making this determination, the Court rejected the District of Columbia's central argument that the Second Amendment protects only the right to keep arms in connection with military service. *Id.* at 2789.

That the Court's decision turned on historical analysis is of more than mere academic interest. As discussed more fully *post*, whether a legislative restriction prohibits the exercise of the right to bear arms now, after *Heller*, hinges in great part on the strength of the restriction's historical justification.

2. Factors affecting whether a restriction violates the Second Amendment.

Although *Heller* did not specifically articulate a test for determining the constitutionality of a firearms regulations under the Second Amendment, the Court's review of the statute at issue in the case, as well as other relevant language in the opinion, make clear what factors a court must examine in determining whether a firearms restriction passes constitutional muster.

First, the Court emphasized that the historical justification for the gun restriction was a primary consideration in determining whether it impermissibly burdened Second Amendment rights, much as the Court relied upon its historical analysis in determining the meaning of the Second Amendment itself. For example, the Court stated that because this was "the first in-depth examination of the Second Amendment," it did not clarify the entire field of law, including providing "*historical justification*" for those restrictions upon the right to bear arms that might remain permissible. *Heller*, 128 S. Ct. at 2821 (emphasis added). The Court thus held that examination of a firearms restriction's history was indeed the applicable test, while cautioning that it had not yet completed that task in the present opinion, stating: "[t]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* Even the majority's detractors adopted this approach, by looking to "founding-era legal precedent, pointing to various restrictive laws in the colonial period." *Id.* at 2819 (Breyer, J., dissenting).

The Court also placed high importance on whether the firearms restriction placed a

burden on self-defense, which, the Court repeatedly explained, is a lawful purpose for possessing and using arms. In striking down the District of Columbia law, the Court stated that the "inherent right to self-defense has been central to the Second Amendment right," and that the law at issue in the case "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that *lawful purpose*." *Id.* at 2817 (emphasis added). The Court added that the provision of the law requiring firearms in the home to be rendered and kept inoperable at all times "makes it impossible for citizens to use them for the *core lawful purpose* of self-defense and is hence unconstitutional." *Id.* at 2818 (emphasis added).

*Heller* also instructs that a court reviewing a Second Amendment claim must not substitute Congress's or its own views as to the legitimacy or primacy of the right to self-protection. In rejecting the "interest-balancing inquiry" suggested by Justice Breyer, the majority emphasized that the constitutional right to bear arms for self-defense, as conceived and adopted by the people at the time of the founding of this country, must be respected and enforced despite what future generations of legislators or judges might come to think of such a right:

> The very enumeration of the right takes out of the hands of the government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.

128 S. Ct. at 2821 (emphasis in original). In other words, lower courts must enforce the right to self-defense despite whether the legislature enacting the law under review – or the reviewing court itself – disagrees with or feels it necessary to limit the scope of that right.

Although *Heller* did not announce the precise degree of scrutiny required of laws restricting Second Amendment rights, one district court has suggested that because the Constitution directly guarantees the right of an individual to possess and carry arms, limitations on ownership or possession of firearms "are subject to some level of increased scrutiny," especially statutes that impose criminal penalties for the exercise of this enumerated right. *United States v. Kitsch*, 2008 WL 2971548 (E.D. Pa. Aug. 1, 2008).

3. <u>The Court's dicta regarding felon in possession statutes is not applicable here</u>.

*Heller* briefly discusses the possible limits of the Second Amendment's reach, stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," or other restrictions, in the time, place and manner of firearms possession. *Id.* at 2816-17. While this passage might seem to limit Mr. Bonner's challenge to 18 U.S.C. § 931, a careful reading of this portion of the opinion reveals that the Court instead left open the question whether that statute can withstand a Second Amendment challenge.

The Court prefaced its statement with the caveat that it had not yet undertaken the required historical analysis of felons with firearms laws. *See id.* at 2816-17 ("*Although we do not undertake an extensive historical analysis today of the full scope of the Second Amendment*, nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons . . .") (emphasis added); and, *id.* at 2821 ("Justice Breyer chides us . . . for not providing extensive historical justification for those regulations of the right that we describe as permissible. . . . [T]here will be time enough to expound upon the[ir] historical justifications if and when those exceptions come before us."). In other words, the majority itself stated that it was merely naming the exceptions that it thought might apply, but without citing historical evidence.

Justice Breyer similarly calls into question the soundness of the majority's assumption that prohibitions on felons' possession of firearms would remain valid in the wake of its decision. "I am similarly puzzled by the majority's list . . . of provisions that in its view would survive Second Amendment scrutiny. . . . Why these? Is it that similar restrictions existed in the late 18th century? The majority fails to cite any colonial analogues." Id. at 2869-70.

In the same vein, it is noteworthy that the Court limited the types of prohibitions that presumably would survive its opinion to those that were "longstanding." *Id.* at 2816. Contrary to the Court's observation, the prohibition at issue in Mr. Bonner's case is of very recent vintage.

    4. <u>18 U.S.C. § 931, as applied to Mr. Bonner, violates the Second Amendment</u>.

Section 931 makes it "unlawful for a person to purchase, own, or possess body armor, if that person has been convicted of a felony that is (1) a crime of violence . . .; or (2) an offense under State law that would constitute a crime of violence under paragraph (1) if it occurred within [federal] jurisdiction . . .." Because this statute "imposes criminal penalties for the exercise of an enumerated constitutional right," it is the type of restriction that is subject to *Heller's* analysis. *See Kitsch*, 2008 WL 2971548, at *7.

Section 931 fails *Heller's* tests. Badly. At the outset, there is no historical justification for the statute, *see Heller*, 128 S. Ct. at 2821, as Congress did not pass the legislation until 2002. James Guelff and Chris McCurley Body Armor Act of 2002, Pub. L. 107-273, Div. C, Title I, § 11009, Nov. 2, 2002, 116 Stat. 1819. Undersigned counsel is aware of no analogous restriction on body armor that existed at the time of the adoption of the Second Amendment or since. The all-important historical justification factor clearly weighs against this law's constitutionality.

Next, *Heller* requires a reviewing court to examine whether the firearms restriction in question burdens the right to self-defense and thus limits a citizen's ability to use the arms for a lawful purpose. *Heller*, 128 S. Ct. at 1217-18. As stated *ante*, *Heller* makes clear that the term "arms" in the Second Amendment includes body armor. 128 S. Ct. at 2791. The Tenth Circuit has held that body armor is indeed an object of self-defense, and that in most instances, using it *reduces* the risk of violence: "[W]earing body armor is not an inherently threatening act. Much of the time, wearing body armor is an act of self-defense, which reduces rather than increases crime." *United States v. Patton*, 451 F.3d 615, 629 (10th Cir. 2006). Section 931 thus burdens a defendant's constitutional right to protect himself. In fact, unlike the provision at issue in *Heller*, the statute here represents a total[3] and permanent abrogation of the right to defending

[3] Section 931 does contain an "affirmative defense" provision, inapplicable in this case, which allows a defendant to possess body armor within the confines of employment. 18 U.S.C. § 931(b).

oneself, based on Congress's novel and recent decision to ban a particular class of citizens from access to these "arms."

As applied to Mr. Bonner, section 931 burdens his use of constitutionally-protected "arms" for what – outside of the existence of this statute – would have been a lawful[4] and purely defensive means of self-protection. Mr. Bonner was not carrying a gun or any other illegal item or substance when the police discovered that he was wearing body armor. He was contacted by the police only because of a minor traffic infraction. In addition, Mr. Bonner had a specific defensive purpose for wearing the body armor, in that his cousin had been killed by a gun the preceding evening. While Congress's stated purpose in passing the Body Armor Act of 2002 was the "serious threat to community safety posed by criminals who wear body armor during the commission of a violent crime," Pub. L. 107-273, Div. C, Title I, § 11009, Mr. Bonner was wearing the armor defensively and was not engaged in criminal activity. His conduct therefore falls outside the scope of conduct that Congress had in mind as it carved out this exception to the right to self-protection. Because section 931 impermissibly burdens Mr. Bonner's right to self-protection by prohibiting him from using body armor for an otherwise lawful purpose, this factor also weighs against this statute's constitutionality.

Lastly, *Heller* instructs that Congress and the courts must put aside their own views regarding the utility of the Second Amendment and instead interpret such constitutional protections as having been "enshrined with the scope they were understood to have when the people adopted them." 128 S. Ct. at 2821. Congress acted in disparagement of the right of self-protection when it enacted the Body Armor Act of 2002. Put another way, even though Congress may have had a commendable motive in mind when it passed this legislation, its purity of

---

[4] As the Tenth Circuit noted in *Patton*, "Congress has not prohibited the manufacture, distribution, sale, possession, or use of body armor. Members of the U.S. military, federal agents of the CIA and FBI, local police officers, security guards, hunters, convenience store owners – all non-felons – are free to buy, own, and possess body armor. Companies are free to produce and sell it." 451 F.3d at 627.

purpose does not save the statute: "The very enumeration of the right takes out of the hand of the government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis added).[5]

*Heller* makes clear that section 931, as applied to Mr. Bonner, violates the Second Amendment: it is a recently enacted law, with no known colonial analogue; it directly and completely inhibits the exercise of self-defense; and, in this prosecution, it prohibits Mr. Bonner's otherwise lawful conduct in using body armor for self-defense and not for committing crimes. Congress impermissibly elevated its modern-day concerns about the potential for abuse of body armor by felons above what *Heller* has determined are the "enshrined" and inherent rights of self-defense. The Court should therefore dismiss the indictment.

**4. Conclusion**

For the reasons stated, Gregory Allen Bonner respectfully requests that the Court dismiss the indictment.

Dated: August 19, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

JEROME MATTHEWS
Assistant Federal Public Defender

---

[5] Courts have concluded that Congress may also have exceeded its authority under the Commerce Clause in enacting this legislation. *E.g.*, *Patton*, 451 F.3d at 634-35 (concluding that the statute did not fall within any of the three *Lopez* categories, but upholding it on the basis of stare decisis); *United States v. Kitsch*, 307 F. Supp. 2d 657 (E.D. Pa. 2004) (upholding body armor statute but noting Congress's weak jurisdictional basis and suggesting that it would consider an as applied challenge at trial). The statute's weak, if not non-existent, jurisdictional basis, along with its recent vintage, demonstrate that it does not have a strong justification for its existence, especially when weighed against the Second Amendment interests it impinges upon.

# Exhibit A

# RICHMOND POLICE DEPARTMENT 0710

## Patrol Bureau Supplement

CASE NO: 07-112714

PAGE NO: 3 OF 4

| CODE SECTION | CRIME/CLASSIFICATION | LOCATION |
|---|---|---|
| 12370(A) PC | Violent Felon in Poss. of Body Armor. | S. 7th and Virginia |

Victim State Of California

DATE OF ORIGINAL 12-9-07

NARRATIVE:

On 12-8-07 at approx. 2045 hr, Ofc. Cantrell, Arrow (K-9) and I were on routine patrol in a marked RPD patrol unit #30, and in full police uniform. Ofc. Cantrell was driving, Arrow (K-9) was secured in the rear portion of the vehicle and I was seated in the passenger seat.

We were traveling E/B on Virginia approaching the intersection with S.7th Street. We both observed a white Van traveling S/B on S. 7th Street approaching the intersection with Virginia. The white Van was driving in the hours of darkness with only it's parking lights on, being in violation of 24800-VC.

We turned on the overhead red/blue lights and conducted a traffic stop on the white Ford Van Ca. license # 5Z25286 at the intersection of S. 7th and Virginia. I approached and contacted both male occupants from the passenger side of the vehicle. The driver was identified as (S) BONNER, Gregory Allen from his valid California Driver License. The passenger was identified to me verbally as (W) [redacted]

A records check revealed that BONNER was on federal probation for a gun charge. I had BONNER exit the vehicle and noticed that he was wearing a ballistic vest. Ofc. Cantrell then told me that BONNER is a violent felon and has many gun convictions. I placed BONNER in handcuffs to the rear, the handcuffs were double locked and checked for tightness. I requested a transport car for BONNER.

The front passenger [redacted] also had an outstanding warrant out of Contra Costa County [redacted] [redacted] was handcuffed to the rear, the handcuffs were double locked and checked for tightness.

Both subjects were transported to El Cerrito Jail by Ofc. Fonseca.

Once at El Cerrito Jail Ofc. Cantrell ran BONNER's criminal history and handed it to me. I

| REPORTING OFFICERS | TYPED BY | Date | ROUTED BY |
|---|---|---|---|
| Kaiser, TA #1482 | TAK | 12-9-07 | GAB-0032 |

Robbery ___ SS Cnpt. ___ Com. Rel. ___ Fraud ___ A.T. ___ C.A. ___ Homicide ___ D.A. ___ Property ___ Patrol Cnpt. ___ Stat ___ CIB Cnpt. ___ Admin. ___ Traffic ___ Juv. ___ I.A. ___ Vice ___ Other ___ Other: ___ Total ___ Assigned: ___

| RICHMOND POLICE DEPARTMENT 0710<br>Patrol Bureau Supplement | CASE NO: 07-112714<br>PAGE NO: 4 of 4 |
|---|---|

| CODE SECTION | CRIME/CLASSIFICATION | LOCATION |
|---|---|---|
| 12370(A) PC | Violent Felon in Poss. of Body Armor. | S. 7th and Virginia |

Victim State Of California — DATE OF ORIGINAL 12-9-07

noticed that BONNER was convicted for 245(a)(2)-PC, two counts in 9-23-1991. BONNER has one other gun conviction in 5-25-1993. BONNER was booked into El Cerrito Jail for 12370(a)-PC. During the booking process I took a second chance ballistic vest with a trauma plate from BONNER. I called the federal probation office in Oakland, CA but only got a message recorder.

[redacted] was cited and released form the El Cerrito Jail. BONNER was given a citation from the jailer with a noticed to appear, which he signed in my presence.

The white Van was towed/stored for 22651(h)-VC by Freeman Towing. Ofc. Martin filled out the CHP-180 on scene.

Request routing to the District Attorney's Office for the prosecution of BONNER.

GAB-0033

| REPORTING OFFICERS | TYPED BY | Date | ROUTED BY |
|---|---|---|---|
| Kaiser, TA #1482 | TAK | 12-9-07 | |

Robbery __ SS Capt. __ Com. Rel. __ Fraud __ A.T. __ C.A. __ Homicide __ D.A. __ Property __ Patrol Capt. __ Stat __ CIB Capt. __ Admin. __ Traffic __ Juv. __ I.A. __ Vice __ Other __ Other: ____ Total ____ Assigned: ____

# Exhibit B

SFGate.com

# Pair of shootings kill 2 in Richmond

Robert Selna, Chronicle Staff Writer
Sunday, December 9, 2007

**(12-08) 22:12 PST RICHMOND** -- Two men died and two others were injured in two separate shootings that occurred about an hour apart in Richmond on Friday night, police said.

In the first shooting just after 9 p.m., Demonte Tinsley, 35, was struck by several gunshot rounds fired from a moving vehicle in the 600 block of Eighth Street, according to Richmond police Lt. Arnold Threets. Tinsley was airlifted to John Muir Medical Center in Walnut Creek, where he later died.

In the second incident, about 10:20 p.m., three men were shot near the corner of 15th Street and Chanslor Avenue.

Police, who were called by neighbors hearing gunshots, found Nickolas Obiedo, 18, with a gunshot wound to the upper torso and pronounced him dead on the scene, Threets said.

A short distance away, police found two other men who had been shot. Antonio Farias, also 18, and Dale Farias, 24, were taken to local trauma centers in stable condition.

Threets said that police had retrieved no weapons and had no suspects thus far. Anyone with information regarding the shootings is asked to call the Richmond Police Homicide Division at (510) 620-6612 or the anonymous tip line at (510) 232-TIPS.

*E-mail Robert Selna at rselna@sfchronicle.com*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/12/09/BAN6TR4BJ.DTL

# In Loving Memory
# Of
# Demonté Antoine Tinsley

Sunrise: January 10, 1972

Sunset: December 7, 2007

Services:
Monday, December 17, 2007
11:00 AM

FULLER MORTUARIES
4647 Enterprise Blvd
Oakland,CA 94601

Reverend Charles Stewart, Officiating

## *Active Pallbearers*

*Michael Harris*
*Ennis Bolton*
*Lamont Robinson*
*Gregory Bonner Jr.*
*Lamar Walker*
*George Byrd*

## *Honorary Pallbearers*

*Derrick Brice*
*Michael Reese Jr.*
*Gregory Byias Jr.*
*Michael Reese Sr.*
*Charles Reese*
*Edward James*
*Gregory Cooper Jr.*
*Voncherio Grisby*
*Dwayne Williams*
*Bobby Dozier Jr.*

## *I'm Free*

*Don't grieve for me for now I'm free. I'm following the path God laid for me. I took his hand when I heard Him call; I turned my back and left it all. I could not stay another day, to laugh, to love, to work or play. Tasks left undone must stay that way; I found that peace at the close of day. If my parting has left a void, then fill it with remembered joy. A friendship shared, a laugh, a kiss, Ah yes, and these things I too will miss. Be not burdened with time of sorrow, I wish you the sunshine of tomorrow. My life's been full; I've savored so much, good friends, good times, and a loved one's touch. Perhaps my time seemed all too brief; don't lengthen it now with undue grief. Lift up your heart and share with me. God wanted me now,*
*He set me free.*

## *Acknowledgements*

*The family wishes to acknowledge with deep appreciation the many comforting messages, prayers, and other expressions of kindness and concern during this period of grief. May God bless you.*

-THE FAMILY

*Fuller Mortuaries*
*4647 Enterprise Blvd*
*Oakland, CA 94601*