1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney

2

3  BRIAN J. STRETCH (CABN 163973)
   Chief, Criminal Division

4  JAMES C. MANN (CABN 221603)
   Assistant United States Attorney

5

6  1301 Clay Street, Suite 340-S
   Oakland, California 94612
   Telephone:  (510) 637-3705

7  Facsimile:  (510) 637-3724
   E-Mail:     James.C.Mann@usdoj.gov

8

9  Attorneys for Plaintiff

10            UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12               OAKLAND DIVISION

13  UNITED STATES OF AMERICA,          )   No. CR-08-00389 SBA
                                       )
14          Plaintiff,                 )   GOVERNMENT'S OPPOSITION TO
                                       )   DEFENDANT'S MOTION TO DISMISS
15      v.                             )   INDICTMENT
                                       )
16  GREGORY ALLEN BONNER,              )   Date:     September 23, 2008
                                       )   Time:     11:00 a.m.
17          Defendant.                 )   Court:    Hon. Saundra Brown
                                       )             Armstrong
18  _____)

19          The United States of America respectfully requests that the Court deny Defendant

20  Gregory Allen Bonner's motion to dismiss the indictment.

21                        **INTRODUCTION**

22          Defendant admits, as he must, that the Supreme Court expressly stated "nothing in our

23  opinion [in District of Columbia v. Heller] should be taken to cast doubt on longstanding

24  prohibitions on the possession of firearms by felons . . . ." 128 S. Ct. 2783, 2816-17 (2008).  Yet

25  defendant relies principally, if not solely, on the same opinion to argue that the possession of

26  body armor – which defendant categorizes as "arms" – by violent felons is protected by the

27  Second Amendment.  Defendant cites no case in which any court has accepted his argument; in

28

1    fact, every reported case since the Supreme Court's decision in <u>Heller</u> has expressly rejected

2    defendant's argument.

### FACTUAL BACKGROUND

4    As stated in Defendant's Motion, on December 8, 2007 at approximately 8:45 p.m.,

5    Richmond Police stopped Bonner's van for a traffic violation. <u>See</u> Exhibit A to Defendant's

6    Motion. During the traffic stop, the officers noticed that Bonner (the driver of the van) was

7    wearing body armor and, knowing that he was a violent felon, arrested him for being a violent

8    felon in possession of body armor. <u>Id.</u> Indeed, Bonner has one prior felony conviction for

9    assault with a firearm on a person.

10    Although irrelevant for purposes of this motion, Bonner offers that there is no evidence

11    that he was participating in or enroute to violent criminal activity when he was arrested wearing

12    body armor. Defendant's Motion at 2:15-20. Through his attorney -- and without any affidavit

13    or declaration from Bonner himself -- Bonner claims to have been wearing the body armor purely

14    for defensive reasons. <u>Id.</u> at 2:17-18. He claims that because his cousin was killed the previous

15    evening, he "feared that as a known relative he was himself in danger." <u>Id.</u> at 2:18-20. It is

16    notable, however, that in connection with the instant offense, Bonner was stopped by police

17    approximately one mile from the location where his cousin was killed. <u>See</u> Exhibit A to

18    Defendant's Motion (noting Bonner was stopped at 7th Street and Virginia in Richmond,

19    California) and Exhibit B to Defendant's Motion (noting Demonté Tinsley was killed on the 600

20    Block of 8th Street in Richmond, California). Moreover, according to the police report and the

21    Probation Office's Form 12s in this matter, Bonner lives approximately 44 miles away in Oakley,

22    California. <u>See</u> Exhibit 1 to this Opposition at p. 1; Petition for Arrest Warrant for Offender

23    Under Supervision in Case No. CR-01-40136 SBA at p. 7. It defies logic that, fearing for his

24    life, Bonner drove 44 miles from Oakley, California to be within one mile of the location where

25    his cousin was murdered the night before in Richmond, California.

### ARGUMENT

27    Bonner asks this Court to extend the Supreme Court's narrow holding in <u>District of</u>

28    <u>Columbia v. Heller</u> well beyond its reaches. In so doing, he also asks this Court to reject as

1  "dicta" the express limitations the Supreme Court put on its holding.  The Supreme Court's

2  holding is succinctly stated:

3      In sum, we hold that the District's ban on handgun possession *in the home* violates the

4      Second Amendment, as does its prohibition against rendering any *lawful firearm in the*

5      *home* operable for the *purpose of immediate self-defense.*

6  Heller, 128 S.Ct. at 2821-22 (emphasis added).  The holding is expressly limited to "lawful

7  firearm" possession "in the home" for the "purpose of immediate self-defense."  Id.  Moreover,

8  the Supreme Court explicitly stated: "nothing in our opinion should be taken to cast doubt on

9  longstanding prohibitions on the possession of firearms by felons . . . ."  Id. at 2816-17.  Bonner's

10  proposed expansion of the Heller opinion to permit the possession of firearms or body armor by

11  felons should be rejected.  Indeed, every reported decision to date after the Heller decision has

12  expressly rejected Bonner's argument.  See, e.g., United States v. Gilbert, No. 07-30153, 2008

13  U.S. App. LEXIS 15209 at *4-5 (9th Cir. July 15, 2008) (noting that the possession of machine

14  guns and short-barreled rifles and the possession of firearms by felons are all still prohibited

15  post-Heller); United States v. Harden, No. 06-79-KI, 2008 U.S. Dist. LEXIS 54717 at *1-2 (D.

16  Or. July 16, 2008) (upholding prohibition on possession of firearms by felons).[1]

17  _____

18  [1]See also, United States v. Skoien, No. 08-cr-12-bbc, 2008 U.S. Dist. LEXIS 66105 at *1-
   5 (W.D. Wis. Aug. 27, 2008) (upholding prohibition on possession of firearms by persons
19  convicted of misdemeanor crimes of violence); Triplett v. Roy, No. 5:08cv123, 2008 U.S. Dist.
   LEXIS 65680 at *1-2 (E.D. Tex. Aug. 25, 2008) (upholding prohibition on possession of
20  firearms by felons); United States v. Fincher, Nos. 07-2514, 07-2888, 2008 U.S. App. LEXIS
   17209 at *9-12 (8th Cir. Aug. 13, 2008) (upholding prohibition on possession of machine guns
21  and unregistered sawed-off shotguns); United States v. Singletary, No. 5:08-CR-12(HL), 2008
   U.S. Dist. LEXIS 61012 at *1-2 (M.D. Ga. Aug. 11, 2008) (upholding prohibition on possession
22  of firearms by felons); United States v. Booker, No. CR-08-19-B-W, 2008 U.S. Dist. LEXIS
   61464 at *9 (D. Maine Aug. 11, 2008) (upholding prohibition on possession of firearms by
23  persons convicted of domestic violence); United States v. Bledsoe, No. SA-08-CR-13(2)-XR,
   2008 U.S. Dist. LEXIS 60522 at *7-12 (W.D. Tex. Aug. 8, 2008) (upholding prohibition on
24  purchase of firearm from federally licensed dealer by persons under 21); United States v. Henry,
25  No. 08-20095, 2008 U.S. Dist. LEXIS 60780 at *2-3 (E.D. Mich. Aug. 7, 2008) (upholding
   prohibition on possession of firearms by felons); United States v. White, No. 07-00361-WS,
26  2008 U.S. Dist. LEXIS 60115 at * (S.D. Ala. Aug. 6, 2008) (upholding prohibition on possession
27  of firearms by persons convicted of domestic violence); United States v. Hall, No. 2:08-00006,
   2008 U.S. Dist. LEXIS 59641 at *2-3 (S.D. W. Va. Aug 4, 2008) (upholding prohibition on
28  possession of firearms by felons and prohibition on carrying of concealed weapon without

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT
No. CR-08-00389 SBA                    -3-

1  **I.  THIS COURT SHOULD REJECT – AS HELLER EXPRESSLY REJECTS – BONNER'S ARGUMENT THAT FELONS HAVE A SECOND AMENDMENT RIGHT TO POSSESS FIREARMS.**

3      It should be emphasized at the outset what the Supreme Court's opinion in Heller did not involve. The issue in Heller did not concern possession of a firearm by any type of "prohibited person" as defined by federal law. See 18 U.S.C. § 922(g). Rather, Heller addressed a District of Columbia law that broadly prohibited residents from possessing operable handguns in their homes. It was a "total ban on handguns, as well as [a] requirement that firearms in the home be kept nonfunctional even when necessary for self-defense." Heller, 128 S.Ct. at 2788; see also, id. at 2817 ("[T]he law totally bans handgun possession in the home. It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable.").

      The Supreme Court held that a "total ban on handguns" and operable firearms in the home, even when necessary for self-defense, violates the Second Amendment. Id. at 2817-18. In reaching that conclusion, the Supreme Court held that there is an individual right under the Second Amendment for non-prohibited persons to possess a handgun in the home, which is "the most popular weapon chosen by Americans for self-defense in the home," and "a complete prohibition of their use is invalid." Id. at 2818.

      The specific facts of Heller are important. The plaintiff in Heller was not a felon. He was a special police officer in the District of Columbia, who applied to register a handgun that he wanted to keep in his home. Id. at 2788. In finding that the plaintiff had a Second Amendment right to possess an operable handgun in his home for self-defense, the Supreme Court

---

permit); United States v. Irish, No. 06-4082, 2008 U.S. App. LEXIS 16304 at *1-2 (8th Cir. July 31, 2008) (upholding prohibition on possession of firearms by felons); United States v. Woodington, No. 07-CR-222, 2008 U.S. Dist. LEXIS 56827 at *2 (E.D. Wis. July 25, 2008) (upholding prohibition on possession of firearms by felons); United States v. Robinson, No. 07-CR-202, 2008 U.S. Dist. LEXIS 60070 at *3-5 (E.D. Wis. July 23, 2008) (upholding prohibition on possession of firearms by felons); Mullenix v. Bureau of Alcohol, Tobacco, Firearms and Explosives, No. 5:07-CV-154-D, 2008 U.S. Dist. LEXIS 51059 at *6-8 (E.D.N.C. July 2, 2008) (upholding prohibition on importation of machine gun); United States v. Dorosan, No. 08-042 DIVISION "B"(3), 2008 U.S. Dist. LEXIS 49628 at *10-15 (E.D. La. June 30, 2008) (upholding prohibition on carrying firearms on postal property).

1  emphasized: "[N]othing in our opinion should be taken to cast doubt on longstanding

2  prohibitions on the *possession of firearms by felons* and the mentally ill, or laws forbidding the

3  carrying of firearms in sensitive places such as schools and government buildings, or laws

4  imposing conditions and qualifications on the commercial sale of arms." Id. at 2816-17

5  (emphasis added).  This express limitation on Heller's holding, as it applies to felons, puts an end

6  to the question of whether Heller can be used to argue for a Second Amendment right for felons

7  to possess firearms.

8          The Supreme Court previously upheld the predecessor felon-in-possession statute in

9  Lewis v. United States, 445 U.S. 55 (1980) (upholding validity of 18 U.S.C. App. § 1201(a)(1)

10  (repealed; similar provision codified at 18 U.S.C. 922(g))).  Upholding a conviction for receipt of

11  a firearm by a felon, the Supreme Court said in Lewis:

12          These legislative restrictions on the use of firearms are neither based upon

13          constitutionally suspect criteria, nor do they entrench upon any constitutionally protected

14          liberties.  See United States v. Miller, 307 U.S. 174, 178 (1939) (the Second Amendment

15          guarantees no right to keep and bear a firearm that does not have "some reasonable

16          relationship to the preservation or efficiency of a well regulated militia").

17  445 U.S. at 65 n.8.  The Heller Court discussed this section of Lewis because the District of

18  Columbia invoked it as rejecting an individual right to bear arms.  The Heller Court noted that

19  the passage could not bear much weight given that it was relegated to a footnote and the Second

20  Amendment claim was not raised by the parties in that case.  Heller, 128 S. Ct. at 2816 n.25. But,

21  given the Heller Court's explicit limitation of its holding with respect to the felon-in-possession

22  laws, the narrow holding of Lewis – that felons have no Second Amendment right to possess

23  firearms – remains good law.

24          Moreover, respecting Heller's emphasis upon the original meaning of the Second

25  Amendment, felons have no better Second Amendment argument after Heller than they did

26  before; and that would be the case even if Heller had not expressly stated as such.  As explained

27  in Donald B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second

28  Amendment, 82 Mich. L. Rev. 204, 266 (1983), the constitutionality of prohibiting felons from

possessing firearms "cannot seriously be questioned on a theory that felons are included within 'the people' whose right to arms is guaranteed by the second amendment." Explaining further:

Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. . . . Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them. All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent.

Id.; see also, Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign?, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms].").

Additionally, courts of appeals recognizing an individual right to bear arms before Heller already rejected the notion that the Second Amendment protected possession by felons. See Parker v. District of Columbia, 478 F.3d 370, 399 (D.C. Cir. 2007) (noting that laws prohibiting felons from possessing arms "promote the government's interest in public safety consistent with our common law tradition. Just as importantly, however, they do not impair the core conduct upon which the right was premised."); see also, United States v. Emerson, 270 F.3d 203, 261 (5th Cir. 2001) ("[I]t is clear that felons . . . may be prohibited from possessing firearms").

Furthermore, the right to keep and bear arms is one of several civic rights that have historically been forfeited by felons, and the constitutionality of that forfeiture is settled. For example, felons have long been denied the right to vote in many states. The constitutionality of that loss of rights is expressly recognized in section 2 of the Fourteenth Amendment, and the Supreme Court explained and upheld such forfeiture in Richardson v. Ramirez, 418 U.S. 24 (1974). Felons are typically also prohibited from jury service – see, e.g., 28 U.S.C. § 1865(b)(5) – which has been upheld.[2] The right to keep and bear arms is a civic right and commission of a

---

[2] See, e.g., United States v. Barry, 71 F.3d 1269, 1273-74 (7th Cir. 1995); United States v. Arce, 997 F.2d 1123, 1127 (5th Cir. 1993); United States v. Greene, 995 F.2d 793, 798 (8th Cir.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT
No. CR-08-00389 SBA                                        -6-

1  felony is a proper basis for curtailing certain civic rights and obligations that apply to law-abiding

2  citizens.  That remains true even when the civic right is grounded in the Constitution.

3       In sum, the Court's opinion in <u>Heller</u> is clear and decisive in this case:  "[N]othing in our

4  opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms

5  by felons . . . ."  128 S. Ct. at 2816-17.

6  **II.**     **THE HELLER "TEST" PROPOSED BY BONNER IS NOT SUPPORTED BY**

7         **THE HELLER OPINION.**

8       Bonner admits that the <u>Heller</u> Court "did not specifically articulate a test for determining

9  the constitutionality of a firearms regulation under the Second Amendment."  Defendant's

10  Motion at 5:9-10.  Indeed, the <u>Heller</u> Court declined to establish such a test.  128 S. Ct. at 2821.

11  Yet, Bonner goes on to state that <u>Heller</u> requires a two part analysis when considering the

12  constitutionality of statutes restricting firearms: (1) a consideration of the historical justification

13  for the statute; and (2) an examination of the statute's burden on an individual's right to self

14  defense.  Defendant's Motion at pp. 5-6 and 8-9.  This, however, is not the "test" implied or

15  intended by the <u>Heller</u> Court.

16       First, Bonner contends that because the law prohibiting the possession of body armor by

17  violent felons (18 U.S.C. § 931) was not passed until 2002, and because there was no analogous

18  restriction at the time the Second Amendment was adopted, the "historical justification factor

19  clearly weighs against the law's constitutionality."  Defendant's Motion at 8:8-13.  Bonner's

20  claim that the statute must be sufficiently "historical" or in place at the time the Second

21  Amendment was adopted is not supported by the <u>Heller</u> opinion.  For example, the <u>Heller</u> Court

22  repeatedly stressed that the Second Amendment does not protect the possession of machine guns.

23  <u>See, e.g.</u>, 128 S. Ct. at 2815-16 ("That would be a startling reading of the [<u>Miller</u>] opinion, since

24  it would mean the National Firearm Act's restrictions on machineguns . . . might be

25  unconstitutional.").  Yet, the Firearms Owners' Protection Act, which prohibits the possession of

26  machine guns, was not enacted until 1986.  P.L. 99-308, § 110(c) (1986).  Thus, it is clear from

27

28 ─────────────────────

1993); <u>United States v. Foxworth</u>, 599 F.2d 1, 4 (1st Cir. 1979).
GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

1    Heller itself, that the Court did not intend to require that the prohibition be in place at the time

2    the Second Amendment was adopted or that it otherwise be sufficiently "historical."

3        The second factor of the "test" proposed by Bonner requires "a reviewing court to

4    examine whether the firearms restriction in question burdens the right to self-defense and thus

5    limits a citizen's ability to use the arms for a lawful purpose." Defendant's Motion at 8:14-18.

6    This, of course, fails to recognize that classes of "prohibited persons" (e.g., felons) are prohibited

7    from possessing arms for any purpose, including self defense. See Heller, 128 S.Ct. at 2816-17.

8    If this were the test, Bonner's argument that the body armor prohibition "represents a total and

9    permanent abrogation of the right to defending oneself, based on Congress's novel and recent

10   decision to ban a particular class of citizens from access to these 'arms'" (see Defendant's

11   Motion at 8:22 - 9:2), would apply equally to laws prohibiting felons from possessing firearms in

12   any context. The Heller Court, however, expressly foreclosed the argument that felons had any

13   right under the Second Amendment to possess firearms. See Heller, 128 S.Ct. at 2816-17.

14       Moreover, although on different constitutional grounds, at least one other defendant has

15   previously challenged 18 U.S.C. § 931, claiming that – as Bonner claims here – he had a right to

16   wear body armor to protect himself from his enemies. United States v. Patton, 451 F.3d 615 (10th

17   Cir. 2006) (rejecting Commerce Clause and Due Process Clause challenges to 18 U.S.C. § 931).

18   In Patton, the defendant claimed to be a reformed gang member who feared reprisal from former

19   rival gangs. 451 F.3d at 619. The defendant provided two examples detailing confrontations

20   with former-rival gang members, including one in which he was the target of a drive-by shooting.

21   Id. As a result, the defendant claimed to have purchased a bulletproof vest, which he wore solely

22   to protect himself. Id. The defendant was later arrested when officers responded to a domestic

23   disturbance call and found the defendant wearing the bulletproof vest; no other weapons were

24   found in the defendant's possession at the time. Id. The court rejected the defendant's self-

25   protection arguments – which were very similar to Bonner's arguments in the instant case –

26   finding that the Due Process Clause does not give an individual the right to protect himself

27   through illegal means, nor does it require the government to protect a person's life, liberty and

28   property from third parties. Id. at 636-37.

1    Finally, Bonner gives short shrift to the important policies furthered by the prohibition on

2  the possession of body armor by violent felons.  The James Guelff and Chris McCurley Body

3  Armor Act of 2002 (resulting in the enactment of 18 U.S.C. § 931) is supported by Congress'

4  finding that "nationally, police officers and ordinary citizens are facing increased danger as

5  criminals use more deadly weaponry, body armor, and other sophisticated assault gear."  P.L.

6  107-273, § 11009 (2002).  Congress cited specific examples to illustrate that finding:

7        [R]ecent incidents, such as the murder of San Francisco Police Officer James Guelff by

8        an assailant wearing 2 layers of body armor, a 1997 bank shoot out in north Hollywood,

9        California, between police and 2 heavily armed suspects outfitted in body armor, and the

10       1997 murder of Captain Chris McCurley of the Etowah County, Alabama Drug Task

11       Force by a drug dealer shielded by protective body armor, demonstrate the serious threat

12       to community safety posed by criminals who wear body armor during the commission of

13       a violent crime.

14  P.L. 107-273, § 11009 (2002).[3]  Therefore, the prohibition is supported by significant and

15  specific policy concerns.

16                                        **CONCLUSION**

17    Based upon the above, the United States respectfully requests that the Court deny

18  Defendant Gregory A. Bonner's motion to dismiss the indictment.

19

20  DATED: September 2, 2008                    Respectfully submitted,

21                                              JOSEPH P. RUSSONIELLO
                                                United States Attorney
22

23

24                                              JAMES C. MANN
                                                Assistant United States Attorney
25

26

27

28
        [3]Newspaper articles regarding the three incidents mentioned in support of the law are
     attached to this Opposition at Exhibits 2, 3, and 4.
     GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT
     No. CR-08-00389 SBA                        -9-

# EXHIBIT 1

PD 1304

# RICHMOND POLICE DEPT. 0710

401 - 27th Street
Richmond, California 94804

☐ DOMESTIC VIOLENCE
☐ VIC VIOLENT CRIME 60 OR OLDER CUSTODY

HATE RELATED IN ☒

CASE NO. 07-112714    PAGE 1 OF 4

| CODE SECTION | TITLE | CLASSIFICATION | FELONY | X |
|---|---|---|---|---|
| 12370-PC | Violent Felon in Poss. of Body Armor | | MISDEMEANOR | |

| DATE & TIME OCCURRED - DAY | DATE & TIME REPORTED | WHERE OCCURRED |
|---|---|---|
| 12-8-07/ 2055 Hrs | 12-8-07/ 2045 Hrs | S. 7th & Virginia |

**VICTIM**

VICTIM NAME - LAST, FIRST, MIDDLE (FIRM OR BUSINESS): State of California

**OTHERS INVOLVED**

INVL CODES VIC - VICTIM WIT - WITNESS RP - REPORTING PARTY: Wit

**SUSPECT #1 (LAST, FIRST, MIDDLE):** Bonner, Gregory Allen    NICKNAME/AKA: None    SEX: M    RACE: B    AGE: 33    HT: 5'11"    WT: 230    HAIR: BLK    EYES: BRO

SUSPECTS ADDRESS: 2095 Truman Ln. Oakley, Ca. 94561

CLOTHING DESCRIPTION: Black hooded sweatshirt, blue jeans, black shoes    CITE: N/A    ARREST: N/A    MIRANDA ☐ YES ☐ NO

**VEHICLE**

INVL CODES VIC - VICTIM RUS - SUSPECT OTH - OTHER: OTH    LICENSE NUMBER: 5Z25286    LIS: California    V/Y: 2008    V/YR: 1999    V MA: Ford    V MD: Van    V ST: 2-Dr    V CO: White

TOWED BY: Freeman's Towing    ADDITIONAL VEHICLE IDENTIFIED: Ladder rack on top, sliding door on right side.

**ROUTING**

| ROUTING | COM REL | | | |
|---|---|---|---|---|
| AT | HOMICIDE | / | PROPERTY | STAT / |
| ADM | JUV | | VICE | STATA |
| S.O DAPT | FRAUD | | CA | DA |
| UNI DAPT | BIG DAPT | | TRAFFIC | IA |

R FILE 1
TOTAL 3

REMARKS: L. TIRONA

GAB-0030

# RICHMOND POLICE DEPT. 0710

| 128 CASE NO. | 129 |
|---|---|
| 07-112714 | PAGE Z of 4 |

**127 INVESTIGATIVE ACTIVITIES N/A**

- [ ] 1 Denied for Latents
- [ ] 2 Tool Marks Photographed
- [ ] 3 Vehicle/Auto Tracks Photographed
- [ ] 4 Scene Photographed
- [ ] 5 Victim Photographed
- [ ] 6 Scl Diagramed
- [ ] 7 Neighbors Checked
- [ ] 8 Area Checked
- [ ] 9 Area Checked
- [X] 10 Witness(es) Contacted
- [ ] 11 Victim(s) Contacted
- [ ] 12 Took Who?
- [ ] 13 Del Notified Who?
- [ ] 14 Other Physical/Injury Survey Completed
- [ ] 15 Teletype or BOL
- [ ] 16 Saw

**132 PHYSICAL EVIDENCE**

- [ ] FP Finger Prints
- [ ] PA Other Prints
- [ ] WP Weapon
- [ ] TL Tool/Marks
- [ ] VH Vehicle
- [ ] PH Photos
- [ ] KA Hair
- [ ] ST Saliva
- [ ] BL Blood/Saliva
- [ ] FI Projectile (Bullet)/Casing
- [X] CL Clothing
- [ ] TT Tire Tracks
- [ ] IB Insulation/Dust
- [ ] PS Paint Samples
- [ ] GL Glass/Fragments
- [ ] DO Documents
- [ ] MS Mud/Soil

**129 SOLVABILITY**
- [X] SUSPECT CAN BE NAMED
- [X] SUSPECT CAN BE LOCATED
- [X] SUSPECT CAN BE DESCRIBED
- [X] SUSPECT CAN BE IDENTIFIED
- [X] THERE IS A WITNESS TO CRIME
- [ ] THERE IS SIGNIFICANT M.O. PRESENT
- [ ] MAJOR PROPERTY LOSS ($5,000 OR OVER)
- [ ] STOLEN PROPERTY IS TRACEABLE
- [ ] STOLEN PROPERTY CAN BE IDENTIFIED
- [ ] SERIAL NUMBERS ARE KNOWN
- [X] THERE IS SIGNIFICANT PHYSICAL EVIDENCE
- [X] SUSPECT VEHICLE LICENSE IS KNOWN
- [X] SUSPECT VEHICLE CAN BE DESCRIBED
- [X] SUSPECT VEHICLE CAN BE IDENTIFIED

**130 VICTIM VULNERABILITY**
1 2 VICTIM
- [ ] ELDER [ ] Elderly
- [ ] MENTL [ ] Mental Disability
- [ ] PHYDB [ ] Physical Disability
- [ ] YOUNG [ ] Young/Small
- [ ] FORGN [ ] Foreign

Weapon Used Against Victim [ ] Yes [X] No

**131 VICTIM ACTIONS**
1 2 VICTIM
- [ ] FROST [ ] Involved with Prostitute
- [ ] ALONE [ ] Alone
- [ ] AWAY [ ] Away From Scene of Crime
- [ ] HITCH [ ] Hitch Hiking
- [ ] WALK [ ] Walking

MORE . . .

**CONTINUED . . .**
1 2 VICTIM
- [ ] INRES [ ] In Residence/Home
- [ ] JOG [ ] Jogging
- [ ] PILOT [ ] In Parking Lot
- [ ] SLEEP [ ] Sleeping
- [ ] DRIVE [ ] Driving
- [ ] SHOP [ ] Shopping

**CONTINUED . . .**
1 2 VICTIM
- [ ] BIKE [ ] Biking
- [ ] UND [ ] Under the Influence
- [ ] OTHER [ ] Other
- [ ] WAIPT [ ] Waiting for Public Transit
- [ ] PAPPT [ ] Passenger, Public Transit
- [ ] PAPPV [ ] Passenger, Private Vehicle

**133 NARRATIVE**   See typed report.



GAB-0031

| 134 REPORTING OFFICER | 134 I.D. # | 135 APPROVED BY: | 136 DATE |
|---|---|---|---|
| T. KAISER | 1982 | | |

| | CASE NO: 07-112714 |
|---|---|
| **RICHMOND POLICE DEPARTMENT 0710**<br>Patrol Bureau Supplement | PAGE NO:<br>3 OF 4 |

| CODE SECTION | CRIME/CLASSIFICATION | LOCATION | |
|---|---|---|---|
| 12370(A) PC | Violent Felon in Poss. of Body Armor. | S. 7th and Virginia | |
| Victim State Of California | | | DATE OF ORIGINAL<br>12-9-07 |

NARRATIVE:

On 12-8-07 at approx. 2045 hr, Ofc. Cantrell, Arrow (K-9) and I were on routine patrol in a marked RPD patrol unit #30, and in full police uniform. Ofc. Cantrell was driving, Arrow (K-9) was secured in the rear portion of the vehicle and I was seated in the passenger seat.

We were traveling E/B on Virginia approaching the intersection with S.7th Street. We both observed a white Van traveling S/B on S. 7th Street approaching the intersection with Virginia. The white Van was driving in the hours of darkness with only it's parking lights on, being in violation of 24800-VC.

We turned on the overhead red/blue lights and conducted a traffic stop on the white Ford Van Ca. license # 5Z25286 at the intersection of S. 7th and Virginia. I approached and contacted both male occupants from the passenger side of the vehicle. The driver was identified as (S) BONNER, Gregory Allen from his valid California Driver License. The passenger was identified to me verbally as (W) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A records check revealed that BONNER was on federal probation for a gun charge. I had BONNER exit the vehicle and noticed that he was wearing a ballistic vest. Ofc. Cantrell then told me that BONNER is a violent felon and has many gun convictions. I placed BONNER in handcuffs to the rear, the handcuffs were double locked and checked for tightness. I requested a transport car for BONNER.

The front passenger ▮▮▮▮▮▮ also had an outstanding warrant out of Contra Costa County ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ was handcuffed to the rear, the handcuffs were double locked and checked for tightness.

Both subjects were transported to El Cerrito Jail by Ofc. Fonseca.

Once at El Cerrito Jail Ofc. Cantrell ran BONNER's criminal history and handed it to me. I

| REPORTING OFFICERS | TYPED BY | Date | ROUTED BY | |
|---|---|---|---|---|
| Kaiser, TA #1482 | TAK | 12-9-07 | GAB-0032 | |

| Robbery ___ Com. Rel. ___ A.T. ___ Homicide ___ Property ___ Stat ___ Admin. ___ Juv. ___ Vice ___ Other: ___ Assigned: ___ |
|---|
| SS Capt. ___ Fraud ___ C.A. ___ D.A. ___ Patrol Capt. ___ CIB Capt. ___ Traffic ___ I.A. ___ Other: ___ Total ___ |

| | CASE NO: 07-112714 |
|---|---|

# RICHMOND POLICE DEPARTMENT 0710
## Patrol Bureau Supplement

PAGE NO:
4 OF 4

| CODE SECTION | CRIME/CLASSIFICATION | LOCATION |
|---|---|---|
| 12370(A) PC | Violent Felon in Poss. of Body Armor. | S. 7th and Virginia |

Victim: **State Of California**

DATE OF ORIGINAL
12-9-07

noticed that BONNER was convicted for 245(a)(2)-PC, two counts in 9-23-1991. BONNER has one other gun conviction in 5-25-1993. BONNER was booked into El Cerrito Jail for 12370(a)- : / : PC. During the booking process I took a second chance ballistic vest with a trauma plate from BONNER. I called the federal probation office in Oakland, CA but only got a message recorder.

██████████ was cited and released form the El Cerrito Jail. BONNER was given a citation from the jailer with a noticed to appear, which he signed in my presence.

The white Van was towed/stored for 22651(h)-VC by Freeman Towing. Ofc. Martin filled out the CHP-180 on scene.

Request routing to the District Attorney's Office for the prosecution of BONNER.

GAB-0033

| REPORTING OFFICERS | | TYPED BY | Date | ROUTED BY |
|---|---|---|---|---|
| Kaiser, TA #1482 | | TAK | 12-9-07 | |

| Robbery | Com. Rel. | A.T. | Homicide | Property | Stat | Admin. | Juv. | Vice | Other | Assigned: |
|---|---|---|---|---|---|---|---|---|---|---|
| SS Capt. | Fraud | C.A. | D.A. | Patrol Capt. | CIB Capt. | Traffic | I.A. | Other | | Total |

# EXHIBIT 2

1 of 4 DOCUMENTS

Copyright 1994 The Chronicle Publishing Co.
The San Francisco Chronicle


NOVEMBER 15, 1994, TUESDAY, FINAL EDITION

**SECTION:** NEWS; Pg. A1

**LENGTH:** 883 words

**HEADLINE:** Grim Search at S.F. Death Scene
 Police officer dies from shootout wounds

**BYLINE:** David Dietz, Susan Sward, Thaai Walker, Chronicle

**BODY:**

A San Francisco police officer died yesterday after he was shot Sunday by a gun-obsessed loner who fired more than 100 rounds before a SWAT team gunned him down. Three others were wounded when the gunman began firing wildly in the lower Pacific Heights neighborhood.

James Guelff, 40, the first San Francisco officer to die on the job since 1982, was shot by Vic Lee Boutwell, 37, police said. Officers described Boutwell as a man fascinated with military weapons and magazines for mercenaries. Just a week ago, they said Boutwell told relatives: "You're going to be surprised by what I'm going to do."

Guelff's death yesterday morning came almost nine hours after he responded to a "shots fired" report from Franklin and Pine streets. There he encountered Boutwell, a 5-foot-11, 200-pound man carrying five high-power weapons and a thousand rounds of ammunition. Boutwell was dressed in full combat garb -- military fatigues, boots, helmet and bulletproof vest.

Guelff -- a 10-year department veteran and father of two -- was the first officer on the scene at 6:30 p.m. Sunday. Three minutes later, he lay wounded on the pavement, shot by Boutwell. One of his wounds was from a bullet fired into his head.

Before Boutwell shot Guelff, he wounded a passer-by, and later he wounded another police officer and a paramedic before a four-man San Francisco SWAT team on a rooftop shot and killed him. On his body were a police scanner, some gunpowder and fuses. He left no note.

Mayor Frank Jordan responded to the deaths in a message sent from Vietnam, where he is on a trade mission. The killing underscored the need to ban "these weapons of war" carried by the assailant, Jordan said.

"I don't want to attend any more funerals or services for police officers or citizens who have fallen victim to such random and senseless acts of violence," he added, saying efforts must be redoubled to obtain a federal ban on weapons such as those Boutwell used.

Before Sunday, Boutwell's major run-in with authorities occurred in 1988 when, according to San Jose police, he barricaded himself in his bedroom at the home of his parents. Police, who helped Bout- well's mother flee the home, found dozens of guns and some grenades in the home.

Police described Boutwell, who attended Cupertino High School, as a transient who had been living in his 20-year-old van on the back roads of Santa Cruz County. He was not known to have any friends, and he reportedly made the "you're going to be surprised" statement last week when he called relatives and got them to wire him some money in Mexico.

Grim Search at S.F. Death Scene Police officer dies from shootout wounds The San Francisco Chronicle NOVEMBER 15, 1994, TUESDAY, FINAL EDITION

Officers said that they found three vials of pain-killer medicine on Boutwell's body and that they knew he had been under the care of a psychiatrist.

"He was a typical survivalist gun freak," said Alex Fagan, a San Francisco homicide officer acting as lead investigator in the case.

Boutwell's rampage Sunday began when he pulled off a carjacking in Mountain View shortly after 4 p.m. and drove north in the stolen car, a Lexus. At 6:29 p.m. Bout- well parked the Lexus on Pine Street and stopped a second vehicle -- a BMW -- forcing the owner to flee the scene. When the call came about shots being fired, Guelff was riding alone in his police car.

Police Chief Anthony Ribera said Guelff was shot about 6:33 p.m. after he climbed out of his car to approach the BMW, which was double-parked on Pine Street.

Boutwell was standing on the sidewalk when he leaned over the Lexus and fired several shots at Guelff. Police say Guelff used all six of his bullets, and they speculate that he was reloading when he was shot. Fellow officers praised Guelff as an outstanding, well-respected officer who received a 1990 medal of valor for apprehending a suspect who was firing a .357- caliber Magnum revolver at the corner of Hayes and Buchanan streets in the Western Addition.

Guelff is survived by his former wife and two children, an 8- year-old daughter and 6-year-old son.

Al Trigueiro, president of the Police Officers Association, said Guelff's death reminds all officers about the danger of their jobs. "We try to put out of our mind that on any given day one can lose his or her life," Trigueiro said.

The officer wounded by Boutwell was John Payne, a 20-year veteran who like Guelff was working out of Northern Station in the Western Addition.   Yesterday, Payne, who was shot in the liver, was reported to be in stable condition at San Francisco General Hospital.

A third person wounded at the scene, health department paramedic Melanie Brandon, was shot in the left forearm as she tried to reach Guelff as he lie on the street. Ribera praised the 31-year-old Brandon, saying, "We are in debt to her for her courageousness."

Robert Pinckney, 35, of San Francisco, was also shot by Boutwell when Pickney and a companion encountered Boutwell at Franklin and Pine. Pickney was reported to be in fair condition at San Francisco General. He was shot in the right leg and right arm.

San Francisco Supervisor Barbara Kaufman, acting mayor while Mayor Jordan is in Vietnam, said flags on city buildings will fly at half-staff until Guelff is buried. Funeral arrangements are pending. A hospital spokeswoman said last night that his vital organs are being donated to three people.

**GRAPHIC:** PHOTO (2), MAP,(1) Investigators Jim Norris (left) and Michael Gaynor checked holes in window of Pine Street building , BY MICHAEL MALONEY, THE CHRONICLE, (2) An unidentified police officer searched for evidence Sunday night near the body of the gunman at the intersection of Franklin and Pine , BY SCOTT SOMMER-DORF, THE CHRONICLE MAP , CHRONICLE GRAPHIC

**LOAD-DATE:** November 15, 1994

# EXHIBIT 3

54 of 56 DOCUMENTS

Copyright 1997 Times Mirror Company
Los Angeles Times

March 1, 1997, Saturday, Home Edition

**SECTION:** Part A; Page 1; Metro Desk

**LENGTH:** 2614 words

**HEADLINE:** THE NORTH HOLLYWOOD SHOOTOUT;
  GUNFIRE, HOSTAGES AND TERROR;
  2 SUSPECTS SLAIN, 10 OFFICERS INJURED IN HEIST GONE AWRY

**BYLINE:** BETH SHUSTER and DOUG SMITH, TIMES STAFF WRITERS

**BODY:**

In warlike pursuit captured on live TV, dozens of police officers tracked down and killed two heavily armed bank robbers in North Hollywood on Friday in the face of blistering automatic-weapons fire. Ten officers were wounded, including six in a spectacular eruption of firepower that draped a shroud of fear over a vast residential area of the eastern San Fernando Valley.

Three civilians were also hit by gunfire in a confrontation that recalled the apocalyptic 1974 gun battle between police and the Symbionese Liberation Army, the Maoist kidnappers of heiress Patty Hearst in South-Central Los Angeles.

The day brought renewed calls for gun controls and for better weapons to aid outgunned police.

In one of many scenes of inexplicably brazen conduct that appalled the nation, one of the robbers--braced for battle in full body armor--strode across the Bank of America parking lot near Laurel Canyon and Victory boulevards, spraying bullets at outgunned officers moments before he was shot to death on a nearby residential street. Police gunned him down when he stepped out from a hiding spot, apparently to face his death.

The identities of the two dead robbers had not been released by Friday night. At least two other suspects in the robbery were being sought. None of the officers or civilians wounded by gunfire was seriously injured.

The shooting spread rapidly down house-lined streets, placing dozens of square blocks under siege, sending pedestrians ducking for cover, scattering motorists and forcing homeowners behind locked doors for hours.

In pursuit of other possible suspects, police closed streets and freeways and even sealed off 10 nearby public schools. Residents living within the battle zone were advised to stay home or to call 911 for police escorts out of the area.

"I was scared to go out but I did, 'cuz my grandma was out there too," said a 12-year-old witness, Ramella Aleksanyan. "We saw a guy who they shot but he wasn't really dead. He was kinda moving."

In one of countless dramas videotaped by news helicopters--which also came under fire--one of the wounded officers was rescued from the bank parking lot by three colleagues who shielded him with a patrol car, scooped him inside and lurched away backward with one door open.

So lopsided was the disparity in weaponry that nine frantic officers, probably in violation of Los Angeles Police Department policy, barged into a North Hollywood gun shop and borrowed seven rifles and ammunition.

"They asked us if they could have some firepower, namely that would penetrate vests," said the gun store owner, who asked that his name not be used.

When the gunfire stopped after about an hour, it seemed a miracle that so few were wounded.

THE NORTH HOLLYWOOD SHOOTOUT; GUNFIRE, HOSTAGES AND TERROR; 2 SUSPECTS SLAIN, 10 OFFICERS INJURED IN HEIST GONE AWRY Los Angeles Times March 1, 1997, Saturday,

Besides the shooting victims, an officer and a motorist were injured in a collision as police raced through the area. Three other officers sustained minor injuries during the manhunt. The injured were being treated at several hospitals. One officer who was shot was in surgery at Providence Holy Cross Hospital in Mission Hills, and a motorist was in critical condition Friday.

"These are very organized, brutal bank robbery suspects. They're killers," LAPD Cmdr. Tim McBride said into the television cameras, emphasizing the need for people to stay indoors.

Masked Gunmen Storm Bank

At least two heavily armed gunmen--suspects in earlier San Fernando Valley bank robberies--stormed the bank about 9:15 a.m., brandishing fully automatic weapons with 100-round clips.

Barking commands, the masked gunmen herded dozens of terrified customers into a vault.

Police said the robbers turned and fired their weapons back into the bank, wounding one person, as they were leaving with a cart loaded with bags of money. All the cash was recovered at the scene.

A call from a witness who saw the armored men walk into the bank brought the first police units, armed only with handguns. They were engulfed in a gunfight, with combatants and bystanders virtually rubbing shoulders.

Crystal Ransome was leaving the bank as the gunmen entered, pulling masks over their faces. She sought cover in her car when she heard gun reports. "I was laying down in my car, and the next thing I know, a cop is telling me, 'Get out, get out,' " she said. "A cop ran me across the street. He was holding his gun drawn the whole time."

Retreating from the surrounded bank, one robber took cover behind the getaway car--a white sedan--as it crept across the parking lot, blasting away in several directions and reaching inside for ammunition to reload.   At one point, he apparently fired a round through the car window, either hitting or just missing his cohort at the wheel. Then he walked to a residential street, firing bursts of bullets along the way.

As police cautiously closed in, the suspect crouched in shadows between a large truck and a fence, but then stood. Walking along the sidewalk, he exchanged fire with his pursuers, falling after being hit, then jerking gruesomely from a shot to the head.

Meanwhile, as the getaway vehicle drove off in another direction, police shot out its tires. The driver pressed on at low speed. On a residential street nearby, he rammed an approaching car. After it eluded him, he shot through the window of an oncoming truck, apparently to scare away its driver, who fled to a nearby house.

From her porch, homeowner Tagui Guzubashyan saw the suspect get into his truck but abandon it when he couldn't get it started. Methodically, he began to unload weapons from his car trunk, picking his way across the carpet of bullet casings and glass.

Just then a patrol car with automatic weapons blazing out its windows pinned the suspect down behind his car. Three SWAT officers tumbled from the car and opened fire, taking cover behind the wheels.

"We heard maybe 200 or 300 shots," Guzubashyan said. "It was horrible.   It was like in the movies."

Finally, a helmeted officer in shorts took a prone position behind the police car to shoot the suspect's legs. The man died on the street in handcuffs.

In the confusion attending the battles, several pedestrians were detained by officers who ordered them to lie spread-eagled on the asphalt; they were later released after it was determined they were not involved.

Search for Missing Suspects

About 30 minutes after the last gunshots, a mounting army of police and SWAT team members deployed carefully around a backyard littered with equipment and junk. After sizing up the situation for more than an hour, a police battering ram broke down a wall and part of a tool shed where they thought a suspect was hiding.

Officers unleashed police dogs, but after about 30 minutes of searching, the SWAT team determined that no one was in the yard.

THE NORTH HOLLYWOOD SHOOTOUT; GUNFIRE, HOSTAGES AND TERROR; 2 SUSPECTS SLAIN, 10 OFFICERS INJURED IN HEIST GONE AWRY Los Angeles Times March 1, 1997, Saturday,

At 2 p.m., Police Chief Willie L. Williams announced that the police had cleared the last areas where suspects might have been hiding. Twenty minutes later, television stations reported that the police had found a trail of blood in the yard.

The Hollywood Freeway, closed during the battle, reopened about 2 p.m., averting a potential traffic nightmare as commuters headed home for the weekend. But many streets remained closed.

The search for what police believed were two or three more robbers continued through the afternoon with no further success.

Friday evening, Williams said police believed that there had been only two men in the holdup. However, a large force continued to search surrounding streets with dogs while police escorts shuttled residents in and out until late in the night as officers in helicopters kept watch.

A source familiar with the rapidly unfolding investigation said authorities have strong reason to believe that the suspects killed in Friday's shootout also were responsible for two robberies last May.

That source said the techniques employed by the robbers resembled those used by gunmen who robbed a Bank of America branch on Woodman Avenue in Van Nuys on May 2, and another B of A branch on Roscoe Boulevard in Canoga Park on May 31.

He said the robbers in those earlier heists used high-powered weapons, fired rounds in the banks and operated with "military-like precision."

"The MO and physical description are not just close, they are right on," the source said of the May robberies and Friday's. "The weaponry, including the high-velocity rounds, were fired in all these robberies.   And that's an anomaly."

Although it has been nine months since the previous robberies--a long hiatus for bank robbers--the heists last May netted the culprits a substantial sum of money, sources said. That could account for the long break between robberies.

Calls for Gun Control

The widespread terror left city and state political leaders scrambling for explanations and renewing calls for greater gun control.

"We have people equipped for warfare out there--it's unbelievable," said Los Angeles City Councilwoman Laura Chick, who chairs the council's Public Safety Committee. "I can't think of a more graphic, visual reason for the public of the United States of America to all get on board in advocating for rational, reasonable and sensible gun control."

"We have to find a way to eliminate military assault weapons being out on the streets," Chick added. "These people are better armed than our law enforcement experts."

Some lawmakers advocated a state law that would allow the city to enact stronger gun control regulations. They also called for providing more firepower to police.

Inside

* Police worry that live TV coverage might sometimes show too much.   A20

* Bullets tearing the air kept a shocked neighborhood under siege. A21

* Bill Boyarsky and Shawn Hubler on violent fiction and reality. B1

Getaway Route

(1) Suspects flee bank, wounding police officers as they go. One suspect walks, the other dives.

(2) Suspect on foot is downed by police, who are firing (3) from across the street

(4) Suspect in car continues down Archwood, bumping oncoming car as he goes.

(5) Pickup truck coming in opposite direction is abandoned; suspect stops his car.

(6) Police car pulls up; officers fatally wound second suspect.

Under Siege

Page 4

THE NORTH HOLLYWOOD SHOOTOUT; GUNFIRE, HOSTAGES AND TERROR; 2 SUSPECTS SLAIN, 10 OFFICERS INJURED IN HEIST GONE AWRY Los Angeles Times March 1, 1997, Saturday,

Here is a look at the sequence of events Friday morning in North Hollywood when a botched robbery attempt at a Bank of America branch led to a shootout between suspects and police.

The Toll: 2 gunmen killed, 10 police officers, injured 5 bystanders injured.

Police perimeter (as of late Friday): Residents at home who were ordered to remain there, while those who wanted into the area needed a police escort.

Schools: Police officers were deployed to secure the campuses of 10 public schools in a 2-mile radius. Private schools in the area were also instructed to secure their campuses.

Cost to business: Merchants in the area closed their businesses, some of them stuck inside, unable to leave for hours.

Road closures: Hollywood Freeway between I-5 and the Ventura Freeway closed till 2 p.m. Friday. Detours were expected on surface streets in the area for a day or two.

Tactical alert: A citywide tactical alert was declared by the Los Angeles Police Department following the shootout, which allows officers to be held over after the end of their normal shift and a maximum number of officers are made available for duty.

1. Suspects flee bank parking lot, firing at cars, helicopters and police as they go.

2. First suspect killed while walking down sidewalk

3. Second suspect killed while trying to commandeer a truck.

**GRAPHIC:** PHOTO: Officer holds down robbery suspect who was shot near getaway car.   The suspect later died. PHOTO: Officers examine the body of the bank robbery suspects, who was shot to death by police in a furious exchange of gunfire less than a block from the bank.   PHOTOGRAPHER: CAROLYN COLE / Los Angeles Times PHOTO: (Southland Edition, A19) Police Chief Willie L. Williams gives instructions to police officers and Fire Department officials near the scene of the fatal shootout.   PHOTOGRAPHER: RICARDO DeARATANHA / Los Angeles Times PHOTO: Suspects flee bank parking lot, firing at cars, helicopters and police as they go.   PHOTO: First suspect killed while walking down sidewalk PHOTO: Second suspect killed while trying to commandeer a truck.   PHOTO: The shootout began at the Bank of America at 6600 Laurel Canyon Blvd.   and ended half a dozen blocks away. GRAPHIC-CHART: Under Siege, VICTOR KOTOWITZ / Los Angeles Times GRAPHIC-MAP: Under Siege, VICTOR KOTOWITZ / Los Angeles Times GRAPHIC-CHART: Getaway Route / Los Angeles Times

**LOAD-DATE:** December 21, 1998

# EXHIBIT 4

6 of 6 DOCUMENTS

Copyright 1997 The Birmingham News
All Rights Reserved
Birmingham News (Alabama)

October 11, 1997 Saturday

**SECTION:** NEWS; Pg. 1A Vol.   No.

**LENGTH:** 487 words

**HEADLINE:** ROUTINE RAID BECOMES NIGHTMARE ETOWAH OFFICER DIES IN AMBUSH; 3 HURT

**BYLINE:** Rose Livingston News staff writer

**BODY:**

RAINBOW CITY - What was expected to be a routine drug raid Friday   turned into an ambush that left one officer dead and three wounded.

"Our officers didn't have a chance,"  said Etowah County Sheriff James  Hayes.

Peter Christopher McCurley, 47, a  12-year veteran of the Sheriff's Department and commander of the county's drug task force unit, died from multiple   gunshot wounds.

Rainbow City police Investigator Gary  Entrekin, 34, who suffered wounds to the  back and legs, was in serious condition  and in surgery Friday night. Altoona Police Officer Khris Yancey, 26, was in fair  condition with a gunshot wound to the  back. James Rick Correll, 46, a reserve  deputy, also was listed in fair condition  with wounds to the arm and leg, according to information from Riverview Regional Medical Center in Gadsden.

Ezra George Petersen, 50, on whom  police were trying to serve a search warrant, was being treated for minor injuries  at Gadsden Regional Medical Center late  Friday. His acquaintance, Connie Stozzie,  30, was being held in the Etowah County  Jail. Charges had not been filed late Friday.

Hayes said the house Petersen rented  Ambush, Page 5A     Page 1A     on Briar Cliff Road near the Coosa River had been under  surveillance for suspected trafficking in methamphetamine. Seven officers met at the Rainbow City Hall before   executing the search warrant at 11:05 a.m. Believing Petersen would not be armed and not expecting trouble,   McCurley did not wear body armor, Hayes said. But those   inside the house did.

"They were met at the door with an AK-47 with a  100-round drum full of ammunition, and the man blew  them away," he said. "With the assault weapons and the  kind of ammunition used, we don't think a bullet-proof  vest would have stopped it."

Hayes said he received a "terrifying" call during the  melee from officers begging for help. He couldn't estimate how many rounds had been fired, but he said the  house was full of spent cartridges.

"The evidence may indicate that my officer may not  have been dead when the man walked outside and shot  him again," Hayes said. "Point blank."

McCurley is survived by his wife, Donna, and two  grown sons. Funeral arrangements were not available  Friday.

When Hayes held up a rap sheet on Petersen during a  press conference, it stretched almost to his feet. The sheriff said most of the crimes were committed in California.

"We will not rest until Petersen gets what he deserves  and that's the electric chair," he said.

ROUTINE RAID BECOMES NIGHTMARE ETOWAH OFFICER DIES IN AMBUSH; 3 HURT Birmingham News (Alabama) October 11, 1997 Saturday

Neighbors described the man who had lived in the   rental house only a few months as a Harley-Davidson motorcycle rider who stayed to himself.

"We just thought he was a quiet Harley man," said   Chara Kelley, 19, who lives around the corner from the shooting scene. "He had a lot of Harley people around. Nobody in the neighborhood knew them."

The following fields overflowed: KEYWORD = ETOWAH COUNTY SHERIFF'S DEPARTMENT

**LOAD-DATE:** February 24, 2005

2 of 6 DOCUMENTS

Copyright 1997 The Birmingham News
All Rights Reserved
Birmingham News (Alabama)

October 15, 1997 Wednesday

**SECTION:** NEWS; Pg. 3B Vol.   No.

**LENGTH:** 250 words

**HEADLINE:** ETOWAH OFFICERS SAY GUNFIGHT CAPTIVE IS CALIFORNIA EX-CON

**BYLINE:** Rose Livingston News staff writer

**BODY:**

A man wounded in a gun battle that left the commander of Etowah County's drug task force dead had   served time in a California prison for robbery and assault   with a deadly weapon.

George Ezra Petersen, 50, was released from prison 10   years ago after serving less than half of a 13-year sentence, according to California records.

Petersen is in a Gadsden hospital recovering from minor injuries stemming from Friday's shootout with police. Officers were attempting to serve a search warrant at   Petersen's Rainbow City home when they were met with   a barrage from an automatic weapon, according to Etowah County Sheriff James Hayes.

Killed from multiple gunshots was Chris McCurley, 46,   a 12-year veteran of the department. Also injured was Rainbow City police Investigator Gary Lee Entrekin, 34,   who is in intensive care and listed in serious condition, according to a spokesman for Riverview Regional Medical   Center.

The charges that sent Petersen to prison in 1981 were   robbery, holding hostages, assault with a deadly weapon, escape and manufacturing, selling and possession of   weapons. He was paroled in 1987 and discharged from   parole less than a year later.

Drug trafficking and possession charges have been   filed against Petersen and Connie Stozzie, 30, who also was in the house at the time of the raid. Hayes said Monday he expects both also to face capital murder and attempted murder charges.

The following fields overflowed: KEYWORD = ETOWAH COUNTY SHERIFF'S DEPARTMENT

**LOAD-DATE:** February 24, 2005